Ochs v. The People.

ÁDAM OCHS ET AL.

V.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Conspiracy to Defraud Cook County—False Pretenses—False Bills— General Conspiracy to Commit a Series of Illegal Acts—How Proved— Conviction not Dependent upon Success—Proof of Formation Sufficient— Statute of Limitations—Review of Evidence—Division in Opinion.*

1.  Time occupied with proceedings on dilatory motions and petitions interposed by the accused is excluded in estimating the time, under Sec. 438, Criminal Code, providing for a discharge for the want of prosecution.    It seems that the term at which the defendant is committed is excluded under said section.

2.  It is within the discretion of the court to interpose and withdraw from the panel a person unfit to sit as a juror, even after he has been sworn.

3.  It is the object of the rules of law governing the selection and impaneling of jurors to secure competent, fair and impartial jurors.    When this

end has been attained, errors committed in selecting and impaneling the jury will not reverse, as they have resulted in no prejudice to the party complaining.

4. One good count in an indictment will sustain a general verdict, although some of the counts are defective.

5. A conspiracy may be proved by direct or circumstantial evidence, or both. It need not be proved by the direct evidence of an agreement or combination between the conspirators, but the conspiracy of all may be shown by the overt acts of each.

6. A general conspiracy, having for its object the commission of a series of illegal acts, and embracing as many minor conspiracies as there are illegal acts to be perpetrated, may be dealt with as a single conspiracy, and any person entering into it, though only for the purpose of becoming the active instrument in the accomplishment of some of its parts or details, may be charged as a party to the general conspiracy.

7. A conviction for a conspiracy does not depend upon whether the conspiracy has been successful or whether its objects have been carried out. It depends merely upon whether the conspiracy itself has been formed.

8. It is not necessary, in order to charge several persons as joint conspirators, to show that they have been members of the conspiracy at the same point of time.

9. In a prosecution against a number of County Commissioners and others for a conspiracy to obtain money from Cook County by means of false pretenses, it is *held:* That overt acts of all the plaintiffs in error, tending directly to the promotion of the conspiracy, are clearly shown by the evidence; that, although the evidence tends to charge various of the defendants with bribery and other forms of fraud, it also tends to prove the conspiracy charged in the indictment; that the rendering of false bills constituted in law false pretenses; that the conspiracy charged in the indictment was complete when the conspiracy was formed; and that the defense of the Statute of Limitations was not sustained.

[Opinion filed February 16, 1888.]

IN ERROR to the Criminal Court of Cook County; the Hon. EGBERT JAMISON, Judge, presiding.

Messrs. ALEXANDER SULLIVAN and WILLIAM BROWN, for plaint. iffs in error.

The State, by its notice, abandoned the charge of conspiracy to obtain money by false pretenses. Elam v. People, 26 Ala. 48.

The accused can not be convicted on the evidence of other offenses. Gutchins v. People, 21 Ill. 642; Kribs v. People, 82

Ill. 425; Evans v. People, 90 Ill. 384; Regina v. Timothy, 1 Fost. & F. 39; Regina v. Barry, 4 Fost. & F. 389.

The object of the conspiracy, as laid, must be proved. Archbold's Cr. Pr. & Pl. 1847; U. S. v. Mitchell, 1 Hughes, 439; Evans v. People, 90 Ill. 384; U. S. v. Goldberg, 7 Biss. 175, 185; State v. Tramwell, 2 Ired. 379.

Knowledge and intent on the part of a person charged is necessary to make him a conspirator as well as to make his acts and declarations evidence of a conspiracy. Pollman's Case, 2 Camp. 233, cited and quoted in Evans v. People, 90 Ill. 384; Regina v. Barry, 4 Fost. & F. 389; U. S. v. Goldberg, 7 Biss. 11, 123; People v. Powell, 63 N. Y. 88; People v. Mather, 4 Wend. 230; Regina v. Kendricks, 5 Adol. & Ell., N. S., 48.

There must be established between the conspirators a union of wills and sentiments, and concert and co-operation in acts. U. S. v. Goldberg, 7 Biss. 174; Reg. v. Murphy, 8 Car. & P. 297; Commonwealth v. McClean, 2 Parsons (Pa.), 363; People v. Mather, 4 Wend. 230; Commonwealth v. Hunt, 4 Metc. 111; Carson on Conspiracy, 123; McKee v. State, 9 W. Rep. Ind. 838.

The acts which are admissible in evidence of a conspiracy are those done in pursuance of, to advance the object of, and done while the conspiracy is in progress, and before completion or abandonment, and the declarations admissible in evidence of a conspiracy are those only which are in themselves acts, or which accompany acts, and are merely narrative. Carson on Conspiracy, 213, 217; State v. Jackson, 29 La. 354; Clinton v. Estes, 20 Ark. 216; State v. Larkins, 49 N. H. 39; Page v. Parker, 40 N. H. 47; Lynes v. State, 36 Miss. 617; State v. Ross, 29 Mo. 32; State v. Fredericks, 85 Mo. 145; Bishop's Cr. Proc. (3d Ed.) 227.

And if acts are done by some not within the original design, and not consented to by the others, such acts are not admissible in evidence. People v. Leith, 52 Cal. 251; Frank v. State, 27 Ala. 37; Heine v. Commonwealth, 91 Pa. St. 148; People v. Knapp, 26 Mich. 12.

The rule of circumstantial evidence is, that the inference of that which is proposed to be proved must flow naturally from

the circumstances, and that the possibility of any other hypothesis must be excluded. 1 Starkie, Ev., 575; 3 Wharton Cr. L. (Crimes), Sec. 2351; Archbold's Cr. Pr. & Pl., 1841; U. S. v. Cole, 5 McLean, 601; U. S. v. Goldberg, 7 Bissell, 175, 190, 191; Martin v. State, 38 Ga. 295; Orr v. State, 34 Ga. 345; Howard v. Lancaster, 13 N. W. Rep. 211; Mooney v. People, 111 Ill. 388, 403; Fuller v. State, 12 Ohio, 433.

When the jury find there is a conspiracy, the only issue is, was the defendant engaged in it. This issue must be established by evidence of his own acts and declarations, and on this issue he is not liable for the acts of others. Commonwealth v. Judd, 2 Mass. 329; Carson on Conspiracy, 124; U. S. v. Goldberg, 7 Bissell, 175, 188.

Messrs. J. M. LONGENECKER, State's Attorney, and STILES & LEWIS, for defendants in error.

The record in this case will show absolutely that the fraudulent bills and contracts passed during the year 1885, were voted on by all the plaintiffs in error, with the exception of Varnell. Varnell's complicity in the combination for this year, and every year, is without question, for he was at times the collector of the ring, and continually O. K.'d fraudulent bills. While in some instances the fraudulent bills or contracts may have been brought to the attention of the Board by an individual member of the combination, still they all joined in the passing of the bills and awarding contracts admitted to be fraudulent, and in some division of the spoils. Ochs and Wasserman continued in their corrupt business with the combination after they had left the Board, and Wren joined the combination in the latter part of the year 1885, while Wasserman and Ochs were still members of the Board, as evidenced by his participation in the corrupt Lobstein bill of November, 1885; and by his vote on the passing of the corrupt bill on the 5th of December of that year, and by joining the combination he became a party to all the acts committed prior to that time and the subsequent acts of the combination after Wasserman and Ochs had left the Board. So that it will be seen that the combination was a continuing one, and that the

Ochs v. The People.

proofs introduced as to the conspiracy of 1885, were admissible as to the defendant Wren, because he had consented to the acts that they had previously done by recognizing McGarigle as the collector and joining in their votes upon the corrupt bills in question.

The record discloses that Varnell, Van Pelt and Leyden were members of the conspiracy and combination during the entire year of 1884, 1885 and 1886. That Ochs and Wasserman were members of the combination and conspiracy during the entire years of 1883, 1884 and 1885, and that there is no testimony whatever in the record showing that they ever ceased to be members of a conspiracy, while there is testimony showing that they were active members in the combination after they ceased to be members of the County Board. That Wren, at least as early as November, 1885, entered into the conspiracy and combination and continued therein until the trial of this case. So that it appears that during the month of November and December, 1885, all the plaintiffs in error in this case were active participants in the conspiracy to rob Cook County by false pretenses.

One contract or bill, or ten, or a hundred, did not embrace the scope of their wicked conspiracy, but nearly all, running into the thousands from day to day, week to week, month to month, year to year, were the means employed to fraudulently obtain from the treasury of Cook County the people's money. The money obtained upon these false and fraudulent bills and contracts was obtained by false pretenses. These defendants and the others united with the contractors and the employes in this criminal design. The common design was manifest, the system apparent, the complicity of the defendants beyond question. When we take into consideration all the facts produced in proof, the fraudulent contracts, the circumstances surrounding the defendants, their associations, their declarations, their individual acts, their division of the spoils, and their combination and unity of votes, can there be any question but that the unlawful act of one was the unlawful act of all?

BAILEY, J.  On the 2d day of April, 1887, Adam Ochs,

Michael Leyden, John E. Van Pelt, Michael Wasserman, Daniel J. Wren, Harry A. Varnell, John Hannigan, George C. Klehm, James J. McCarthy, Charles F. Lynn, Richard S. McCloughrey, Christian Casselman, Richard M. Oliver, Christian Geils, William J. McGarigle, Frederick W. Bipper, Charles L. Frey and Edward S. McDonald were indicted by the grand jury in the Criminal Court of Cook County for the crime of conspiracy. McGarigle, McDonald, Hannigan, Bipper and Frey were not put on trial, and Klehm and Lynn each entered a plea of guilty. At the June term, 1887, of said court, the other eleven defendants were tried and convicted, the jury, by their verdict, fixing the punishment of Ochs, Leyden, Van Pelt, Wasserman, Wren, McCloughrey and Varnell at imprisonment in the penitentiary for the term of two years, and imposing upon McCarthy, Casselman, Oliver and Geils a fine of $1,000 each. Judgment was pronounced on all the defendants tried in accordance with the verdict of the jury, and Ochs, Leyden, Van Pelt, Wasserman, Wren and Varnell, six of the defendants sentenced to imprisonment in the penitentiary, have brought the record to this court by writ of error.

At the June term of the Criminal Court, and prior to the commencement of the trial, the defendants entered their motion to be discharged for want of prosecution, in accordance with the provisions of section 438 of the Criminal Code, which motion was overruled, and the decision of the court overruling said motion is assigned for error. Said section is as follows:

"Any person committed for a criminal or supposed criminal matter, and not admitted to bail and not tried at or before the second term of the court having jurisdiction of the offense, shall be set at liberty by the court, unless the delay shall happen on the application of the prisoner. If such court, at the second term, shall be satisfied that due exertions have been made to procure the evidence for and on behalf of the people, and there are reasonable grounds to believe that such evidence may be procured at the third term, it shall have power to continue such case till the third term. If such prisoner shall have been admitted to bail for a crime other than a capital offense,

Ochs v. The People.

the court may continue the trial of said cause to a third term, if it shall appear by oath or affirmation that the witnesses for the people of the State are absent, such witnesses being mentioned by name, and the court shown wherein their testimony is material."

The Criminal Court of Cook County has twelve terms each year, commencing respectively on the first Monday of each month. April 2, 1887, the day on which the indictment in this case was returned into court by the grand jury, was the last day of the March term. The next term, which was the April term, commenced on the 4th day of April, and of the plaintiffs in error Ochs, Wasserman, Varnell and Wren were arrested and admitted to bail April 6th, Leyden April 8th and Van Pelt April 9th.

The first question that arises is, whether the April or the May term is to be regarded as the first term within the meaning of the statute above quoted.

This question is not settled, so far as we are aware, by any decision in this State, and we are, therefore, compelled to adopt such interpretation of the statute as seems to us most reasonable, aided by such light as may be derived from decisions in other States giving construction to the provisions of similar statutes. The object of the statute, manifestly, is to fix and limit a time within which the prosecution must bring to trial persons committed or admitted to bail upon criminal charges, and to give all prisoners not tried within the time limited, unless the delay happens on their application, a right to a discharge from their imprisonment or bail, for want of prosecution. The time thus given is two terms of court, and to this may be added a third term, where sufficient grounds for a continuance to such term on account of the absence of material witnesses, is made out by the prosecution. It would thus seem to be the intention of the statute to give the prosecution at least two full terms to bring prisoners to trial before discharging them for want of prosecution. This can be done only by reckoning the term of court convening next after the commitment or admission to bail as the first term. The commitment or admission to bail may take place during a term,

and at any period of the term, even to the very last day or the very last moment before final adjournment, or it may take place after the grand jury has been discharged, so that no indictment against the prisoner can be presented until the next following term. If the then existing term is to be regarded as the first term, the prosecution would, in such cases, be given only one term within which to bring the accused to trial.

The view we have taken is supported by the decisions of the Supreme Court of Virginia upon a statute similar to ours. The statute of Virginia provided that "every person charged with felony and held in any court for trial, shall be forever discharged from prosecution for the offense, if there be three regular terms of such court after he is so held, without a trial," unless the delay shall be caused by the prisoner. In Bell's case, 7 Gratt. 646, a prisoner was held for trial on the 6th day of a term of the Circuit Court, and the question arose whether that term was to be reckoned as one of the three terms specified by the statute. The court, in holding that said term should not be included in the computation, say: "Many mischiefs in the administration of criminal justice might arise, if the term of the Circuit Court, though only an hour before its adjournment, or however engrossed with its business on hand, shall be counted for a term at which the prisoner is held to answer, because the accused has, at that period of the term, been remanded by the examining court. It is very true that potentially the prisoner might be tried during the remaining term of the Circuit Court, when he is remanded by the examining court after the first day of the term. The court may cause another grand jury to be impaneled, though the regular grand jury summoned to the first day may have been discharged, and it may award a *venire facias* for petit jurors, and it may cause the witnesses to be summoned; and the preparatory certificate of the clerk of the examining court may be accepted as satisfactory, though brought in at a subsequent day of the term. It seems much better to take some fixed and uniform rule from the language and meaning of the statute, than a rule derived from what the Circuit Court may be supposed, on a presumed state of its

business, to have the capacity to do. In England the term, according to the common law, is understood as the term of a day, and that day is the first day of the term, to which all the after proceedings have reference. This interpretation is there given in criminal as well as civil proceedings. The same notion has been recognized in our own courts, when the date of a judgment rendered during the term has always had reference to the first day of the term."

In Sand's case, 20 Gratt. 800, which arose under the same statute, the prisoner was brought into court on the first day of the term, and the record of his recognizance to appear was the first entry upon the records of the court for that day, and it was held that said term could not be counted as one of the three terms which must elapse before the prisoner would be entitled to his discharge. See, also, Jones v. Commonwealth, 19 Gratt. 478; Commonwealth v. Adcock, 8 Gratt. 661; Green v. Commonwealth, 1 Rob. 731; 1 Bishop's Crim. Procedure, Sec. 951 f, note 8, where the decisions under statutes of this character are collected.

There seem to us to be very strong reasons for adopting the same rule in the interpreting of our statute. It would be palpably absurd to hold that a term of which but a day, an hour, or a minute remained at the time of the commitment or admission to bail is to be regarded as a term of court at which the accused could be tried so as to impose upon the prosecution the charge of neglect, if the trial is not had. The interpretation of the statute should be reasonable, and should be adopted with a due regard to the objects sought to be attained and the rights sought to be protected by its provisions. If a term just on the eve of adjournment is not to be counted, then upon what principle can a term be counted which has partly elapsed, but which has several days or even weeks remaining before final adjournment? How shall the discrimination be made? How much of the term must remain to entitle the accused to count it as a full term? These questions suggest their own answer. Evidently the statute was intended to create a uniform rule applicable to all cases alike, and if the commitment or admission to bail takes place while the court

is in session, the then current term, if to be excluded from the computation in one case, must be excluded in all.

The only cases in this State in which this statute has been involved are Brooks v. People, 88 Ill. 327, and Gallagher v. People, 88 Ill. 335. In the first of these cases the accused was not tried until after three terms had elapsed, even excluding the term at which the commitment was had, and he was therefore held to be entitled to his discharge, whether the term, in session at the time he was committed, was reckoned as the first term or not. In Gallagher v. People, the defendant sought to have forfeiture of his recognizance, entered more than three terms after he was admitted to bail, set aside, but his motion was denied because it did not appear from the record whether the various continuances were had on his motion or that of the people. It thus appears that in neither of these cases was the question we have discussed either raised or decided.

Adopting the conclusion that the May term was the first term within the meaning of the statute, it follows that the June term, the term at which the defendants were tried, was only the second term, and that the defendants were not entitled to be discharged.

But even if the April term was to be reckoned as the first term, we are still of the opinion that the defendants were not entitled to their discharge. On the 16th day of April, each of the plaintiffs in error filed his petition for a change of venue on account of the alleged prejudice of the inhabitants of Cook County, which petitions were pending until April 26th, at which date they were disposed of by an order of the court denying said petitions. On the following day, each of the plaintiffs in error entered his motion for leave to file a further petition for a change of venue from Judge Tuley, one of the Judges then presiding in the Criminal Court, and one of the other Judges of the Circuit or Superior Court of said county, which motions were granted by the court. The motions altogether embraced the names of Judge Tuley and three of the other Judges of Cook County, qualified by law to hold the Criminal Court. The petitions filed in pursuance of

the leave thus obtained do not seem to have been preserved
in the record, but it appears from the record that on the 22d
day of June the plaintiffs in error appeared and asked leave
to file a motion for their discharge, without prejudice to and
without reference to their petitions for a change of venue,
and the record also shows an order entered June 27th, which,
after reciting that said motion for a change of venue coming on
to be heard, it was agreed by counsel for the plaintiffs in error
and the State's Attorney that this cause should be tried before
Judge Jamieson.    It was ordered that said petitions be
granted, and that the cause be tried before said Judge.

It thus appears that continuously, from the 16th day of
April to the 27th day of June, which was only two days
before the trial actually commenced, there were pending peti-
tions by the plaintiffs in error for changes of venue.    These
petitions were dilatory in their character, and were matters
which necessarily had to be disposed of by the court before
a trial could be entered upon.    The statute gives the accused
a right to a discharge after a second term has elapsed without
a trial only where the delay does not happen on his applica-
tion.    Clearly the time occupied by the presentation and dis-
position of dilatory motions and petitions interposed by the
accused is a delay happening on his application, and unless two
terms have elapsed, not computing the period of such delay,
the right to a discharge does not arise.    Here, during the
entire May term, there were pending petitions for a change of
venue from certain Judges qualified to hold the Criminal
Court, one of them being the Judge actually assigned for the
time being to hold that court and on whose calendar this
cause had been placed and before whom it was actually pend-
ing.    The delay, then, so far at least as the May term was
concerned, may, we think, be fairly chargeable to the plaint-
iffs in error, and that term must, therefore, be omitted from
the computation, thus making the June term only the second
term.

Furthermore, it appears that at ten o'clock in the morning
of the last day of the May term, the plaintiffs in error, with
their counsel, went to the room then occupied by Judge Tuley

for holding one of the branches of the Criminal Court, for the purpose of making a formal demand for a trial, but not finding that branch of the court in session, they repaired to the room then occupied by Judge Shepard for holding another branch of said court and asked leave to file their demand there, which leave being granted the demand was filed. It also appears from an order entered before Judge Tuley the same day, that the plaintiffs in error were called for trial on that day in that branch of the court and failed to appear, and that thereupon the cause, on motion of the State's Attorney, was continued to the next term. Giving full faith to the last mentioned order, as we must, the failure to obtain a trial at that term was due to the absence of the accused, and was a delay for which they alone were responsible.

The next assignment of error to be considered calls in question the action of the court in discharging jurors Tate, Ostrander and Parks. It appears that after these jurors had been examined, accepted and sworn, but before the panel was completed, the State's Attorney filed a petition, verified by affidavit, representing to the court certain facts of which he had received information after said jurors had been accepted and sworn, tending to show that they were improper persons to sit as jurors in the trial of said cause, and praying to be permitted to re-examine said jurors and to challenge them for cause, if sufficient cause should be shown, otherwise to challenge them peremptorily. The court granted the petition to the extent of allowing the said jurors to be re-examined, and on such re-examination it appeared that said Tate, who at the time was a total stranger to the bailiff who served the special venire, was selected and summoned by said bailiff at the suggestion of another person, who was also a stranger to said bailiff; that said Tate and a brother of said Ostrander were acquaintances and intimate associates of Varnell, one of the defendants to be tried, and that since the investigation of the alleged frauds in respect to which the indictment in this case was found, they had met together and discussed Varnell's connection therewith, and that the juror Ostrander was selected and summoned by said bailiff at the suggestion of his said

Ochs v. The People.

brother; that said Parks was an intimate acquaintance with one Kelly, a detective then in the employ of the defendants, and had conversed with him after being summoned as a juror, it appearing from such conversation that he also had been pointed out and selected by some person other than said bailiff; that in said conversation said Kelly told said Parks that certain other parties, whom he indicated, had given the bailiff his (Parks') name, and that he (Kelly) was just coming down from his (Parks') house.   Parks then asked him what he was doing up there, to which Kelly replied: "I wanted to see you. Do you know any of those parties?"—referring, as Parks understood, to the defendants then about to be tried.   Parks, being asked as to what then occurred, answered: "Then I kind of smiled, and I says, 'Sure.'"

Upon the facts disclosed upon said re-examination the court found that neither of said jurors was a suitable person to sit as a juror in the trial of said cause, but held that as said jurors had been accepted and sworn, neither party could be permitted to challenge them, although the court might, in the exercise of a sound discretion, discharge them on his own motion.   Said jurors were thereupon discharged by the court.   We are of the opinion that it is within the discretion of a court to interpose and withdraw from the panel a person unfit to sit as a juror, even after he has been sworn, in order that the ends of public justice may not be defeated.   The existence of this discretion is fully sustained by the following authorities: United States v. Morris, 1 Curtis, 23; State v. Diskin, 34 La. An. 919; State v. Pritchard, 16 Nev. 101; State v. Bell, 81 N. C. 591; Thomas v. Leonard, 4 Scam. 556; see also Mayers v. Smith, 121 Ill. 442.

As said in United States v. Morris, *supra*, it is impossible to define all the circumstances which would render it proper for a court to interfere in the exercise of this discretion.   In that case the juror was discharged by reason of bias; in State v. Duskin, because he stated to the court that he had conscientious scruples against capital punishment; in State v. Pritchard, because he stated that he had scruples against convicting for murder on circumstantial evidence; in State v. Bell, because

he had fraudulently procured himself to be sworn on the jury at the instance of the defendant for the purpose of acquitting him, and in Thomas v. Leonard, because he was an alien.

In the present case the evidence was sufficient to raise a fair inference of bias, as well as an attempt by improper means to foist upon the jury persons friendly to the defendants. We are of the opinion that, under the circumstances, the discharge of said jurors by the court was not an improper exercise of its discretion.

But if we were forced to the conclusion that the court improperly exercised its discretion in discharging said jurors, the judgment could not be reversed for that reason, as it does not appear that the defendants were in any degree prejudiced thereby. The rules of law governing the selection and impaneling of juries are all adopted for the purpose of securing to parties trials by competent, fair and impartial jurors, and when that end has been attained, errors committed in selecting and impaneling the jury will not reverse, for the reason that they have resulted in no prejudice to the party complaining. In the case of Spics v. People, 122 Ill. 1, the rule was laid down that a judgment of conviction in a criminal case will not be reversed for errors committed in the trial court in overruling challenges for cause to jurors, even though the defendant had exhausted his peremptory challenges, unless it is further shown that the objectionable juror was forced upon him after his peremptory challenges were exhausted. The court, in arriving at this conclusion, adopts the reasoning of the Court of Appeals of Texas, in Laggins v. State, 12 Texas App. 65, in which it is said: "Unless objection is shown to one or more of the jury who tried the case, the antecedent rulings of the court upon the competency or incompetency of jurors who have been challenged and stood aside will not be inquired.into by this court. But if one objectionable juror is forced upon the defendant after he exhausts his peremptory challenges, then will he be entitled to have the action of the court reversed."

There is no evidence in this case that either one of the defendants had exhausted his peremptory challenges at the time

the panel was completed. It will therefore be presumed that they and each of them had remaining and unused sufficient challenges to protect themselves against the possibility of the selection of objectionable jurors, and it will also be presumed that no jurors objectionable to them were in fact admitted to the panel. But we are not left to presumptions, as it is expressly admitted in the record that each of the twelve jurors who were finally selected and sworn, and who constituted the panel which tried the case, was accepted by the defendants without the interposition of a challenge, objection, or exception, there appearing, neither to the court, the people or the defendants, any objection or cause of challenge to any of them. After having been tried by a jury thus admitted to be entirely competent, fair and impartial, it does not lie in the mouths of the defendants to complain of any technical errors, if any such were committed, in the selection and impaneling of said jury. If such error was committed it was wholly without prejudice to the defendants.

The next question, and indeed the most important question presented by the record, is, whether the evidence is sufficient to warrant a conviction of the plaintiffs in error of the offense charged in the indictment. The indictment as presented by the grand jury contains five counts. The first charges that the plaintiffs in error and the other defendants therein named, and divers other persons whose names are to the said jurors unknown, on the 1st day of November, 1885, in the County of Cook, feloniously, fraudulently and deceitfully did conspire and agree together, with the fraudulent and malicious intent then and there feloniously, wrongfully and wickedly, by divers false pretenses, and with indirect means, to cheat and defraud said County of Cook of its moneys, to the great damage, fraud and deceit of said county. The second count alleges that the same parties on the same day, did unlawfully, feloniously, fraudulently and deceitfully conspire and agree together, with the fraudulent and malicious intent then and there feloniously, wrongfully and wickedly to obtain a large amount of personal goods, funds, money and property, to wit, $100,000 lawful current money of the United States, of the value of $100,000,

the personal goods, money and property of said county, from said county, by false pretenses, and to cheat and defraud said county of the same; and that said parties, in pursuance of said conspiracy, combination and agreement, on the 15th day of November, 1885, at said county, feloniously, unlawfully and designedly did obtain a large amount of personal goods, funds money and property, to wit, $100,000 lawful current money of the United States, of the value of $100,000, of the personal goods, funds, money and property of said county, from said county, by false pretenses, with intent then and there to cheat and defraud said county of the same. The third and fourth counts allege a conspiracy between said parties to obtain from said county, by false pretenses, divers large sums of money, of the value of $100,000, and the fifth count alleges a like conspiracy between said parties, and that in execution thereof said parties on the 15th day of November, 1885, did obtain from said county divers valuable written orders and warrants duly drawn by the County Clerk of said county upon the County Treasurer of said county, a more particular description of which said orders and warrants is to said jurors unknown, of a large amount, to wit, of the value of $100,000, and divers large sums of current lawful money of the value of $100,000, of the personal goods and property of said county, by false pretenses, with intent then and there to cheat and defraud said county of the same.

It appears from an entry made by the clerk during the progress of the trial that the State's Attorney elected to proceed under the first four counts of the indictment, thus practically abandoning the fifth count. There are reasons to be drawn both from the nature of the first count and from the character of the instructions to the jury which might lead us to suppose that the entry by the clerk was probably an error, and that the State's Attorney intended to abandon the first instead of the fifth count. But as we view the case, the error, if it be one, is quite immaterial. The last four counts, being each for a conspiracy to obtain money or property from Cook County by false pretenses, are manifestly drawn under Sec. 46 of the Criminal Code, which provides that if two or more persons conspire and agree together, with the fraudulent and malicious

Ochs v. The People.

intent wrongfully and wickedly to obtain money or other property by false pretenses, they shall be deemed guilty of conspiracy.   The first count alleges a conspiracy to cheat and defraud said county of its moneys by false pretenses and is not within the language, at least, of section 46.   Whether it may be regarded as a good count under that section we need not determine, as there still remain three counts, the sufficiency of which are not controverted and under which the trial and conviction were had.   All that we need consider is, whether the first count is a good count under any other section of the Criminal Code, so as to join in the same indictment offenses of a different nature and subjecting the offenders to a different punishment.   The only other section to which we are referred is section 1 of the act to define and punish conspiracies, in force July 1, 1877, and included in Hurd's edition of the Revised Statutes as Sec. 46a of the Criminal Code.   To constitute an offense under that section there must not only be a conspiracy to commit an offense against a county, but one or more of the conspirators must do some act to effect the object of the conspiracy, and as in this case no overt act is alleged in the first count of the indictment, it is perfectly manifest that it is not a count under that statute.   If said count, then, is faulty in alleging a conspiracy to cheat and defraud Cook County of its money by false pretenses, instead of a conspiracy to obtain the money of said county by false pretenses, so as not to constitute a good count under section 46, it may be disregarded upon the well recognized principle that a conviction on a general verdict will be sustained, although some of the counts are faulty, if there be one good count in the indictment.   Miner v. People, 34 Ill. 297.

The indictment was presented by the grand jury, April 2, 1887.   All the plaintiffs in error except Varnell, as well as several of the other defendants named in the indictment, were County Commissioners of Cook County during all or a portion of the period covered by the transactions in question.   The term of Ochs and Wasserman began in December, 1882, and expired December 6, 1885.   The term of Leyden and Van Pelt began in December, 1883, and continued down to December, 1886.

Wren's term began in December, 1884. During all the time covered by the evidence subsequent to September, 1884, Varnell was the warden of Cook County Insane Asylum.

The theory of the prosecution is, that as early as some time in 1883, a conspiracy or combination was formed, consisting of a sufficient number of the then existing Board of County Commissioners, to secure the requisite vote in favor of the various county expenditures and of the approval of accounts and bills rendered therefor, and also of various of the wardens and other officials having charge of the hospital, poor house, insane asylum, normal school, court house and other county institutions and buildings, having for its object the defrauding of Cook County of its money. This combination and conspiracy continued, as is claimed, with more or less changes in its membership and methods, down to the time the indictment was found. The mode usually adopted by the combination to obtain money was, to compel the various parties furnishing materials or labor to the county, or entering into contracts therefor, to pay to the combination or for its benefit, or for the benefit of some of its members, large sums as bonuses or commissions, and to reimburse themselves therefor by rendering accounts in which exorbitant prices were charged, or in which labor or materials were charged for in excess of what had been furnished, the part in the scheme to be performed by the County Commissioners, who were members of the combination, being to control the awarding of contracts in such way as to give them to those only who would pay for them, and to see that the accounts rendered by the parties obtaining such contracts were promptly audited and paid.

The evidence of a combination among the members of the Board of County Commissioners and others, substantially as is alleged by the prosecution, covering the period of time above stated, is so full and conclusive as to exclude from our minds all doubt. Indeed, the fact that frauds of the character above mentioned had been practiced in the county to a very large extent for several years prior to the finding of the indictment, and that each one of the plaintiffs in error is shown by the evidence to have been culpably connected with such frauds, is

Ochs v. The People.

virtually admitted by their counsel, and the proof of their guilt is so conclusive that ordinary fairness compels the admission on their part. The defense is: 1st. That the evidence fails to show a general conspiracy to which all the plaintiffs in error were parties, but a large number of minor conspiracies between certain portions or groups of the accused; and 2d. That however criminal the conspiracies proved may be, they do not amount to conspiracies to obtain money from Cook County by false pretenses.

A conspiracy may be proved by direct or circumstantial evidence, or by a resort to both modes of proof concurrently. Says Mr. Archbold: "A conspiracy is proved either expressly or by the proof of the facts from which the jury may infer it. It is seldom proved expressly, nor can a case easily be imagined in which that is likely to occur, unless where one of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the jury may fairly imply it. It is usual to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring is not improbable; and if to this can be added evidence of any consultations or private meetings between them, there is then a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants in furtherance of the common design. But, although the proof above mentioned is desirable because it satisfies the jury as you proceed, and they are better able to apply the evidence of the overt acts when it is afterward given, yet it is not essentially necessary, as the jury may imply the conspiracy of all from the overt acts of each." 2 Archbold's Crim. Prac. and Plead., 619.

Mr. Greenleaf lays down the rule as follows: "The evidence of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have

that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that the conspiracy originated with the defendants; or that they met during the process of its concoction; for every person entering into a conspiracy or common design already formed, is deemed in law a party to all acts done by any of the other parties, before or afterward, in furtherance of the same design." 3 Greenlf. on Ev., Sec. 93.

The evidence offered to prove the conspiracy charged in the indictment is very voluminous, involving a great variety of transactions with a large number of parties, and it would extend this opinion beyond reasonable limits to attempt anything like an exhaustive analysis of all the evidence on that subject. We must therefore content ourselves with mentioning some portions of the transactions disclosed by the evidence rather by way of illustrating the methods adopted by the alleged conspiracy in carrying out the common design, than with the expectation of giving the substance of all the evidence in detail.

Elisha A. Robinson, a wholesale grocer, who furnished groceries to the county institutions from some time in 1883 to about the time the indictment was found, testifies that he was first solicited to furnish goods to the county by Moritz Wasserman, a brother of Michael Wasserman, one of the plaintiffs in error. After he had furnished a few small bills of goods, Moritz Wasserman came around and asked him if he would be willing to pay a commission of ten per cent. for the county business, and he consented to do so. In pursuance of this arrangement, three payments were made by him to Moritz Wasserman in 1883, and in January, 1884, Michael Wasserman, then being a County Commissioner, commenced to collect said commissions and continued to do so until March, 1885. In the early part of 1885, Robinson called on Ochs, then also a County

Ochs v. The People.

Commissioner, and complained that he had been getting but little of the county business for the preceding six months. Ochs told him that ten per cent. was no inducement, and it was thereupon arranged between them that twelve per cent. should be thereafter paid, and in pursuance of that arrangement the commissions at twelve per cent. were paid to Ochs monthly, from May to December, 1885, of which $648 was paid October 10th, $530 November 19th and $768.64 December 31st.    In addition to the foregoing, Robinson paid to Ochs several sums of $200· each, of which one was paid October 20th, and one November 16, 1885, and one March 8, 1886. In December, 1885, after Ochs and Wasserman had ceased to be County Commissioners, Edward J. McGarigle, then warden of the county hospital, having been appointed general collector for the combination, the twelve per cent. commissions were paid to him until September 18, 1886, the sums so paid during that period aggregating $5,360.32.    Besides this, Wren, then chairman of the committee of charities of the County Board, demanded a further commission of three per cent., which was paid him by Robinson during the year 1885, and during the year 1886 said three per cent. was paid to Van Pelt, who had succeeded Wren as chairman of said committee. Robinson testifies that, after paying these several percentages, he made up the amount so as to leave him a fair profit, in part by the prices and in part by the quantities of goods charged in the accounts which were rendered by him to the county, and which were paid to him by order of the County Board.

William F. Henes, a wholesale druggist, furnished goods to the county during the years 1883, 1884 and 1885.  Van Pelt and Michael Wasserman went to his store and told him that, in order to obtain orders for goods, he would have to pay commissions, and he accordingly paid commissions, making payments in 1883 to Moritz Wasserman, in 1884 to Van Pelt and Michael Wasserman, and in 1885 to McGarigle, Van Pelt and Michael Wasserman.

Frederick W. Bipper, one of the defendants named in the indictment, was awarded the contract for furnishing meat to the county each year from 1880 to 1886.   He also, as it seems,

acted, to some extent, as negotiator and collector for the Com-
missioners, and negotiated and collected the bonuses upon con-
tracts with other parties for furnishing supplies to the county.
At first Bipper paid nothing for his contract. As early as
1883 he was charged a bonus, and that year he paid either
$4,000 or $5,000 for his contract, said money being distributed
among certain of the County Commissioners, Wasserman
being one. The next year he paid $6,000, portions of the
money going to Commissioners Hannigan, McCarthy, Neisen,
Ochs, Sommers, Van Pelt, Wasserman and Lynn. Prior to
1885 Heissler & Junge, Kee & Chappell and William Kolze
had been awarded contracts for supplying the county institu-
tions with milk and bread, and had been charged certain
bonuses therefor, Bipper acting, as to some of them at least,
as agent for the combination in negotiating and collecting such
bonuses. In the early part of 1885 Bipper was informed that
it had been determined to combine the meat, milk and bread
contracts, and that the "boys" expected to receive $1,000
apiece out of those contracts. About that time a meeting of
some five or six of the Commissioners was held at the Galt
House, and Bipper was notified to be on hand. He was
accordingly at the Galt House awaiting the action of the meet-
ing, and at its close he was informed by Leyden that it had
been agreed that he, Heissler & Junge, Kee & Chappell and
Kolze, should be awarded said contracts, provided they would
pay $10,000, to be divided among the Commissioners who
were in the deal. This was agreed to, Bipper acting as col-
lector and disbur er of the money. The money was collected
and $1,000 each was paid to Ochs, Hannigan, Leyden, McCar-
thy, Van Pelt and Wasserman, $800 each to Neisen, Lynn and
McCloughrey, and $300 to F. A. McDonald, one of the Com-
missioners not named as a defendant in the indictment. In
1886 Bipper was informed by Leyden that, in order to obtain
the same contracts for that year, seven of the Commissioners
would have to be paid $1,600 each, and he accordingly raised
$11,200 and paid it over to Leyden, and also paid Neisen $800
and F. A. McDonald $435. How the money was actually dis-
tributed by Leyden is not shown, except that he paid $1,300
of it to Lynn.

In 1884, the J. M. W. Jones Company, which was furnishing the county with printing and stationery, paid to Wasserman, who that year was chairman of the committee of the Board on printing, $1,000 for doing the business. The next year Lynn, having become chairman of said committee, Wasserman suggested to him to see said company and make arrangements for commissions, which he did, and in December of that year collected of said company $1,200, and paid $500 of it over to Wasserman. The next year McGarigle, after being appointed collector for the combination, called on said company and told them that he was not satisfied with the rate of commissions then being paid. Afterward Lynn came in and advised the company to give $200 or $300 more, and this, at a subsequent interview with McGarigle, they agreed to do.

In December, 1884, Henry H. Pond, a commission merchant, met Varnell, with whom he had had some previous acquaintance, and was told by him that he was warden of the insane asylum, and would be down before long to see him. February 14, 1885, Varnell went to Pond's store and ordered a bill of goods, and instructed Pond how to make out his bills for goods purchased, saying at the same time that Pond should pay to him ten per cent. commissions, to which Pond assented. At this interview Varnell said to Pond that no portion of said commissions was for his benefit, but that it all went to the Commissioners. The dealings with Pond continued until February 6, 1886, aggregating $8,390.05, and commissions at the rate of ten per cent. were paid to Varnell from time to time during that period.

In 1884 and 1885 John W. Jinnette sold certain supplies to the county hospital, the business being negotiated with the county through Bipper. Bipper told him that he could have the business if he would pay ten per cent. commissions. This he agreed to do, and he thereby obtained the contract. The commissions were afterward paid to Bipper. A similar arrangement was made and carried out between J. H. Adams and the county through the intervention of Bipper, for supplying butter and eggs to the hospital, infirmary and insane asylum, in 1883, 1884 and 1885. The commissions were paid

to Bipper for securing and retaining for Adams the business, Bipper telling him that he could, at any time, take the business away or secure him more.

The firm of Sharpe & Smith, manufacturers of surgical instruments, after having dealt with the county for some time by way of furnishing surgical instruments for the hospital, infirmary and insane asylum, was applied to in October, 1885, for commissions on their sales by one Murphy, a druggist at the hospital. The firm agreed to pay him ten per cent., and this arrangement was continued until May or June, 1885, when Varnell came around and stated that he had control of the purchases for the three institutions above named, and demanded that a commission be paid to him. Prior to that time said firm had been billing their goods to the county at twenty-five per cent. discount from their list prices, that being all they asked for their goods. Varnell then being a stranger to the firm, they declined to make any arrangement with him at the time. Varnell thereupon said: "You will find out that this is all right with the committee;" and also: "We don't want any discount on bills; we are no paupers." After this interview the firm called in Murphy to ascertain from him how it was that the commissions were to be controlled by Varnell instead of him and received the reply that he did not believe that to be the case but would ascertain. Notwithstanding what Varnell had said, the bill rendered by the firm for May was made out as before, and forwarded to the hospital or asylum, as had previously been done. This bill was not O. K.'d and returned, as had been usual, but, some time afterward Varnell came in, bringing the bill with him, saying that he did not wish it made out in that way; that he did not wish the discount, reminding the firm of his former conversation. They then made out the bill as directed and sent it to the asylum, and in due course it was returned O. K.'d and was paid by the county. In July, 1885, Varnell called on the same firm and told them that thereafter McGarigle would attend to the matter of the commissions, and a day or two afterward Murphy came in and said that the matter was all arranged; that there was a syndicate, consisting of Varnell,

McGarigle and certain of the Commissioners, for which McGarigle was the collector. From that time until November, 1886, the firm made out its bills against the county at their price list without any discount, and paid thirty-five per cent. commissions. These commissions were usually collected by Murphy, twenty-five per cent. being for the syndicate and ten per cent. for himself.

In 1885 the firm of Scace & Bishop, dealers in lime and cement, commenced furnishing goods to the county on Varnell's order, in pursuance of an arrangement with him for the payment of twenty per cent. commissions. Dealings with this firm were carried on and the commissions paid to Varnell down to near the close of the year 1886.

Charles Pick, a dealer in crockery and glassware, commenced selling goods to the county in 1883, the original arrangement with him being made by Michael Wasserman. Wasserman went to him and asked him if he would like to supply the county, and on being informed by Pick that he would be very glad to get that business, told him that he would have to pay ten per cent. commissions on all the business done. This was acceded to, and it was arranged that Wasserman's brother, Moritz, should collect the commissions. Pick paid the commissions to Moritz Wasserman for a time, and afterward to Wasserman himself, and later to McGarigle. While these dealings were going on, Varnell came to Pick's store and selected a quantity of goods for his own use, amounting to $205, and requested Pick in the future to send to the insane asylum one-half of the goods charged for, and so make up for the price of the goods thus appropriated by Varnell to his own use. To this Pick at first demurred, but afterward sent Varnell the goods on the terms proposed.

Hitchcock & Sexton, dealers in tea and coffee, commenced furnishing supplies to the infirmary and insane asylum in May, 1884. The agreement with them was made by Van Pelt, and the commissions agreed upon were thirty-five per cent., it being arranged that the commissions on the supplies furnished to the infirmary should be paid to Frey, and those going to the insane asylum to Varnell. This ran along until about the

close of 1885, when Van Pelt directed that the commissions should be paid to McGarigle. Hitchcock, a member of the firm, testifies that the firm charged, in their bills rendered to the county, enough to cover the commissions and to allow for a profit.

Storm & Hill, dry goods merchants, sold to the county, during the years 1884, 1885 and 1886, a large amount of goods, and during that time, according to the testimony of Hill, a member of the firm, they gave to Varnell, McGarigle and Frey, goods amounting in all to about $6,000, which were never paid for, and which were charged by the firm to the expense account.

In December, 1885, J. G. Lobstein was requested by Wren to submit two estimates of the expense of fixing up certain vaults in the court house, the first upon the basis of using certain old material and the second upon the basis of using all new materials. Lobstein accordingly submitted two estimates, the first being $700 and the second $1,300. Wren directed him to do the work, and he did it, using the old materials, and made out his bill on the basis of his first estimate and gave it to Wren. Wren directed him to make out the bill for $1,300, which he did, and the bill was allowed and paid, and Lobstein afterward paid to Wren the difference. Wren then got him to figure on another vault, and he submitted an estimate of $1,700. Wren directed him to increase the price to $2,225, which being done, the estimate was handed to Wren, and a contract was afterward awarded to Lobstein, who, after the work was done, rendered his bill for the last named sum, and the difference was paid over to Wren. Lobstein was also employed to build a barn at the insane asylum. McGarigle and Varnell went to his house, claiming to have been sent to him by Wren, and told him that there would have to be a commission paid on the job. On Lobstein's protesting that he could not afford to pay such commission, McGarigle replied that they all paid it and that it would be all right. After that time Lobstein added twenty-five per cent. to his bills, to cover the commission.

In the summer of 1886, Charles E. Abbott entered into a

negotiation with McGarigle for the contract to supply the county with coal, and was told by the latter that he would have to pay $11,000 for it. This Abbott agreed to give, but failed to raise the money by the day the County Board was to meet and take action in relation to awarding said contract. McGarigle thereupon procured an adjournment of the Board, and Abbott having raised the money and paid it to McGarigle on a certain Saturday, the contract was awarded to him on the following Monday.

In 1885, one Clybourn, having furnished some gravel for the town of Leyden, in said county, William Kolze, who represented said town, suggested to Clybourn that he would try to get him the contract for graveling a certain public road running east and west between Norwood Park and Milwaukee Avenue and past the insane asylum, which was to be graveled by the county. Clybourn proposed to furnish the gravel, delivered at Dunning station, at $15 per car load. Kolze told him that there was another party who had made a proposition to furnish the gravel at $19 per car load. The matter ran along until some time in February, 1886, when Kolze told Clybourn that he could get the deal through at $19 per car load, provided he would be satisfied with $14 per car load, and pay the $5 as a commission. Clybourn finally consented to this proposition, and the contract was immediately awarded him by the County Commissioners at $19 per car load. Kolze told him that he would have to pay the $5 on 1,000 car loads down, and after some demur the $5,000 was paid by Clybourn to Kolze, the day the contract was awarded. After 650 car loads had been delivered, Clybourn was told by Varnell that they had about all the gravel they wanted, but Clybourn insisted that he had paid a commission on 1,000 car loads, and that he was going to deliver that number. He therefore kept on delivering, until something over 800 car loads had been delivered, when he was peremptorily ordered to stop delivering gravel, and he did so. Clybourn then proposed to render a bill for the gravel he had actually furnished, but Kolze and Varnell told him that they wanted the bill made out for 1,089 car loads; that they wanted about $2,000 more, in addition to

the $5,000, out of the deal, and that if the bill should be made out for 1,089 car loads, it would be all right. Clybourn finally consented to this, and made out his bill accordingly, and in order to cover up the fraud, Varnell desired him to obtain from the railroad agent at Elgin, the place probably from which the gravel was shipped, and from the agent at Dunning, where it was delivered, certificates that the number of car loads stated in the bill had been shipped. Clybourn procured the desired certificates, paying the agent at Elgin $200 and the agent at Dunning $100 therefor. The bill was allowed by the County Board, and Clybourn afterward paid McGarigle and Varnell out of it the sum of $1,800. Of this sum, $600 went to Kolze, $500 to McGarigle and $100 to Bipper, and Clybourn was told by Kolze that the $5,000 was turned over to the "boys," though no names were mentioned.

In the early part of 1886, Chris Pfeiffer had a contract with the county for furnishing bedsteads for the insane asylum and infirmary. While the contract was being filled, Frey told him that there would have to be some money in the bedsteads. Pfeiffer replied that there could be none as he only made 25 to 50 cents apiece, and that he could not pay anything. Frey said, "they have got to have some some way or other," whereupon Pfeiffer asked how it should be done. Frey told him to send twenty-five to thirty bedsteads short. Pfeiffer acted on this suggestion and after his bills were allowed gave Frey $250. Pfeiffer also, about the same time, did some work for the county, repairing boilers. Some time after the work was done McGarigle came to him and wanted some money out of him. Pfeiffer insisted that he could not give him anything because the work was done so cheaply that he was making only a fair profit. McGarigle told him that he had better pay the money desired and make it up on some other job, and thereupon Pfeiffer yielded and gave him a voucher for $487.50.

Clement E. Ireland, an agent of Bramhall, Dean & Company, manufacturers of cooking apparatus, having learned that there was a job in his line to be done at the insane asylum, applied to Varnell for the job, and was told by him to submit an estimate of the work, with the understanding that he

should pay a commission of twenty-five per cent., and that the commissions should be included in the estimate. Ireland accordingly prepared an estimate which included said commissions and which amounted to $7,021.72, and gave it to Varnell. The contract was awarded to Ireland in October 1886, and in February, 1887, after the work was performed, Ireland had a talk with Varnell about getting his bills allowed. At that time the investigation into the frauds committed against the county had been begun and Varnell suggested the expediency of taking off the twenty-five per cent., but Ireland insisted that as it had been written up in the books of his firm, he preferred to let the matter stand as it was.

Thomas Evers was a dealer in horses, and in July, 1886, McCarthy, Varnell, McGarigle and Wren went to his place of business to purchase horses for the county. They bargained for two span of horses at a given price, and at their suggestion Evers added $150 to the price to be paid over as commissions, McCarthy explaining to him that everybody did it. A few days later McCarthy and Varnell purchased of Evers a third span of horses, and at McCarthy's suggestion, $75 was added to the price agreed upon. Bills for said horses were presented to the County Board, and after they had been allowed and warrants drawn therefor, Evers paid over to McCarthy the $225 which had been added to the bills as above stated.

In the winter of 1885–6, William H. Gray, an artesian well contractor, learning that it was proposed to sink an artesian well at the infirmary, said to Frey that he would like to get the job, and Frey promised to let him know about it in time. Afterward, learning from the daily papers that the matter was before the Board for consideration, he went to the Board rooms and meeting Van Pelt, spoke to him about it, and was by him referred to McGarigle. McGarigle told him that his (Gray's) brother was a competitor for the job and had made a pretty good offer, and that unless he, Gray, could increase the price, there was no use in figuring on it. McGarigle said that Gray's competitor had offered to pay $2,200, and Gray, after considering the matter, said that he would give $3,000,

provided he could add the $800 to the contract price. Mc-
Garigle said that would be all right, and accordingly a few
days afterward the arrangement was made, Gray paying Mc-
Garigle the $3,000, and on the same day the contract was
awarded to him.

James B. Clow & Son, steam fitters, plumbers and boiler
makers, had been selling goods to the county for some years,
when, in the early part of 1886, Edward S. McDonald came
to their place of business and, after explaining that he was the
engineer of the county hospital, said that he had come to
see them with regard to their business with the county.
James B. Clow, supposing that he had come to order goods,
referred him to his son who had charge of that department of
their business. McDonald then entered into conversation with
the son and said that he came as the representative of the
County Board and asked what commissions his firm would pay
on the goods furnished to the county, saying that they could
add the commissions to their bills. The younger Clow replied
that they had never paid commissions and never would to get
the business. He then referred the matter to his father, Mc-
Donald being present, and the father approved what the son
had said, whereupon McDonald said that the firm could have
no more of the county business, and from that time the county
business was wholly withdrawn from them. Shortly after the
foregoing occurrences, the younger Clow went to the rooms of
the County Commissioners and saw Klehm, then chairman of
the Board, and repeated to him the conversation with Mc-
Donald and said that he came to see him to know whether his
firm was to continue to receive orders for goods from the
county. Klehm replied, "Mr. Clow, you should know that
we are now in the hands of a ring," and proceeded to argue
the advisability of his firm paying said commissions and to
counsel him to pay them. Clow then said, "Commissioner
Klehm, we will not do it;" to which Klehm replied, "Then
Mr. Clow, you are at the end of your rope."

In the summer of 1886 Nicholas Schneider was employed
by the county, through the instrumentality of Edward S. Mc-
Donald, to make various and extensive repairs on the hospital

Ochs v. The People.

insane asylum, normal school, infirmary and court house. These jobs were all let to Schneider without competition and without any contract in writing. By the terms of his employment he was to be paid for the material used and certain prices per day for the labor employed in doing the work. The evidence tends to show that there was an understanding between McDonald and Schneider that twenty-five per cent. of all the bills was to be paid over to McDonald to be distributed by him among certain County Commissioners, and that Schneider should make up for the commissions thus paid by adding that amount to his bills. For the labor and materials furnished in pursuance of said employment, Schneider rendered to the County Board forty-one bills, aggregating $95,680.06, while his books show that the actual amount paid out for labor and materials furnished by him in the repairs upon the several institutions above mentioned was only $42,058.55. These bills, according to Schneider's testimony, were all made out for more labor and more materials than had been actually furnished, and his testimony is strongly corroborated by that of experts who had made careful estimates and measurements of the work done. The ordinary practice in rendering bills seems to have been to double the true charges for labor and materials, and in some cases charges were made for items which had never been furnished at all. Many of the bills, instead of stating the items of labor and materials furnished, were entirely vague and general, thus not only suggesting but challenging in the strongest possible manner, inquiry and investigation on the part of the Board. The bills, however, in all cases, received the sanction of the proper committee and were allowed by the Board without even the formality of an investigation, the plaintiffs in error, who were then members of the Board, and the other members who are charged in the indictment as conspirators, uniformly acting in their official capacity so as to promote the allowance and payment of said bills without delay or investigation.

In May, 1886, the American Stone and Brick Preserving Company, a company organized for the purpose of utilizing the discovery of one Lundberg of a process for cleaning and

preserving stone, appointed Harry L. Holland as their agent
to solicit business, said agent to receive a commission of ten
per cent. on the contract price of all work obtained by him.
On the 7th day of June, 1886, Holland, acting as the agent of
said company, made a contract with Cook County by which he
undertook to treat the exterior of the walls of the court house
in accordance with this process, the contract price being 30
cents per square foot, payable each alternate Monday as the
work progressed. On the same day the contract was entered
into between Holland and the company by which the latter
undertook to do precisely the same work in the same time for
12½ cents per square foot, to be paid on such measurements as
should be accepted by the county, but not to exceed 220,000
square feet, making the maximum price to be paid to said
company $28,050. This was to be paid from time to time as
estimates should be accepted by the county on Holland's con-
tract, and when the payments made amounted to $28,050, all
further payments to the company were to cease, and the com-
pany was to complete the work without any additional com-
pensation. In pursuance of this arrangement the parties
entered upon the performance of the work, and as it pro-
gressed, Holland presented eleven bills, aggregating 437,500
square feet, and for which he was allowed by the Board $98,-
812.50, the work not then being completed. The evidence
shows that the actual maximum superficial measurement of the
court house is only 246,476 square feet.

The foregoing statement embraces most, though not all, the
specific instances disclosed by the evidence of frauds upon the
County of Cook accomplished or attempted by various mem-
bers of the alleged conspiracy.

The evidence further tends to show that in December, 1885,
after the re-organization of the Board by the election of Klehm
as chairman, there was a meeting of a number of the alleged
conspirators in the janitor's room in the basement of the court
house, at which Van Pelt, Casselman, Hannigan, Leyden,
Lynn and either McCarthy or Wren were present. At that
meeting, as the evidence tends to show, the fact was stated
and discussed that up to that time the chairman of the various

committees had been collecting percentages from contractors and had been appropriating the money so collected as they saw fit, and the object of the meeting was to appoint some one person who should represent all those who were in the combination, and conduct all negotiations with contractors and collect and distribute the moneys obtained from them. The names of Varnell and McGarigle were suggested for the position, but the majority being in favor of McGarigle, he was finally agreed upon. It appears that after that time Mc-Garigle had, in fact, the principal charge of negotiating with contractors for commissions and bonuses and of collecting and distributing the same.

The prosecution also offered in evidence the record of the proceedings of the County Board, and of the several committees thereof, during the period of time covered by the various matters in controversy.

Without pausing to state any portion of the evidence derived from said record in detail, it is sufficient to say, generally, that the members of the Board alleged to have belonged to said conspiracy, and especially the plaintiffs in error, are shown by said record in all their official action in the matter of awarding contracts and providing for the purchase of county supplies, and also in the matter of auditing and allowing the bills presented by contractors and others therefor, to have lent themselves to the furtherance of the objects and purposes of the conspiracy. Contracts were withheld until proper arrangements could be made with the proposed contractors for the payment of the commissions or bonuses demanded, and then the contracts were promptly awarded. Whenever a party furnishing supplies to the county refused to negotiate for the payment of commissions, the dealings of the county with such party were instantly terminated. Fraudulent bills rendered so as to cover the moneys paid for commissions and bonuses were so manipulated as to be audited and allowed promptly and without delay.   ·

The counsel for the plaintiffs in error strenuously contend that, while the various fraudulent acts proved may tend to establish the existence of a large number of minor conspira-

cies between various groups, parts of sections of the parties charged in the indictment, they do not tend to establish a general conspiracy among all of the defendants for the accomplishment of an illegal purpose. The objection here stated is not, in our opinion, in accordance with any rational view that can be taken of the evidence as a whole. It is true the evidence of particular transactions is sufficient to charge the parties immediately engaged in those transactions not only with a conspiracy to perpetrate those particular fraudulent acts, but in most cases with the actual perpetration of them. But a general conspiracy, having for its object the commission of a series of illegal acts, part of the conspirators undertaking to perpetrate one part and others other parts of the acts proposed, necessarily embraces within itself as many minor conspiracies as there are illegal acts proposed to be perpetrated, and those undertaking the accomplishment of any part of the general scheme may be indicted and punished in respect to that particular part. But while this is true, the entire scheme, embracing all its parts and details, constitutes a single conspiracy and may be dealt with as such, and any person entering into the general conspiracy, though only for the purpose of becoming the active instrument in the accomplishment of some of its parts or details, is still guilty and may be charged as a party to the general conspiracy. The question, then, is not whether the evidence establishes a number of minor conspiracies between various groups of the defendants, but whether it shows a general conspiracy among all the defendants; or, to speak more precisely, among the six defendants who are now complaining of the judgment by which they have been convicted of that crime.

That the evidence shows such a general conspiracy is in our judgment too plain to admit of serious controversy. Doubtless there are isolated transactions proved which, when taken in connection with the other evidence, are criminatory in their character, but which, when viewed alone, are susceptible of explanation upon some other hypothesis than that of a conspiracy. But when the whole evidence is viewed in the light of common experience and ordinary observation, the conclusion

is irresistible that during the period of time covered by the evidence, there existed a general conspiracy to defraud the County of Cook of its moneys, and that the plaintiffs in error and various other parties were members of such conspiracy.

As we have already seen, a conspiracy need not be proved by direct evidence of an agreement or combination between the conspirators, but that the conspiracy of all may be shown by the overt acts of each.  Overt acts of all the plaintiffs in error tending directly to the promotion of the conspiracy are clearly shown.  Each one of them is shown to have actually participated in the negotiation and collection of various sums of the money which the conspiracy was organized to obtain, and in addition to this, the five plaintiffs in error who were County Commissioners, are all shown to have directly co-operated by their official action in the promotion of the objects of the conspiracy.

But it is further objected that even if a general conspiracy is shown, it is not the conspiracy charged in the indictment, viz., to obtain money from Cook County by false pretenses. It is admitted that the evidence tends to charge various of the defendants with bribery and different forms of fraud, but that it fails to show that the object of the conspiracy was to commit fraud by obtaining money by false pretenses.  As to some of the transactions proved, the intention to obtain money from the county by false pretenses is doubtless a matter of inference, but in almost every case the inference is a very cogent and conclusive one.  In certain cases contracts were let to the contractors upon the payment of bonuses or their agreement to pay commissions, and the evidence is silent as to the mode in which the contracting party was to be reimbursed for the moneys thus paid out or whether he was to be reimbursed at all.  To suppose, however, that such bonuses of commission were paid as mere gratuities, would be an exceedingly violent presumption, in view of human nature, human motives and human action as they are ordinarily exhibited.  The irresistible conclusion is that in all such cases it was the intention of the parties that the contractor should be reimbursed in some way, and the only way open to such reimbursement was,

by collecting from the county, in addition to the sums actually and justly due, a sufficient sum of money to cover the advances to the conspirators. For this purpose and to this extent the contractor became a co-conspirator, and his acts, within the scope of the general plan to be inferred and presumed from the circumstances under which he was induced to pay over his money became acts in furtherance of the conspiracy and were chargeable upon all the conspirators.

But, as to many of the transactions proved, there was an express agreement or arrangement made at the time the transaction was entered upon, that the contractor might add the amount of the bonus or commission paid by him to the accounts to be rendered by him to the county, with the assurance that bills so rendered would be all right, and it appears that in such cases the accounts were rendered in accordance with this arrangement, and were audited and allowed without question. It may be further observed that the fact that this arrangement was expressly made in many cases, lends an additional reason for presuming that it was intended to be one of the terms of every transaction, either expressed or implied. That the rendering of false bills constituted, in law, false pretenses, can not well be controverted. That the rendering of false bills by contractors, certainly, in many cases, and presumably, in all the transactions covered by the conspiracy, was a necessary part of the general scheme, seems to us, in view of all the evidence, to admit of quite as little controversy. This was one of the recognized means, and, indeed, an indispensable means, for effecting the general purposes of the conspiracy. These false bills constituted the only key in the hands of the conspirators by which they could unlock the vaults of the county treasury and appropriate to themselves and their confederates the money belonging to the county.

But it is said that in order to make out the offense of obtaining money by false pretenses it must be shown, not only that false pretenses have been made and that their falsity was known to the defendant, but that the person to whom they were made was ignorant of their falsity, and was induced to part with his money in reliance upon their supposed truth; and it

Ochs v. The People.

is argued that in this case the County Commissioners, representing the county, being aware of the falsity of the pretenses made by the false bills, the case is not one in which the commission of the offense of obtaining money by false pretenses was possible. We do not deem it necessary to decide whether, under the peculiar circumstances here presented, the parties who rendered false bills to the county and had them allowed, and obtained payment, could have been indicted and convicted for the consummated offense of obtaining money by false pretenses. The defendants in this case are not indicted for that offense, but for a conspiracy to commit that offense. The offense charged in the indictment was complete when the conspiracy was formed, and it can not be said that because circumstances intervened which rendered the consummation of the intended crime impossible, the conspiracy itself was not consummated. A conviction for a conspiracy does not depend upon whether the conspiracy has been successful, or whether its objects have been carried out, but merely whether the conspiracy itself has been formed.

Complaint is made that the defendants were not accorded at the trial, the proper protection of the Statute of Limitations. The offense with which they were charged, being only a misdemeanor, they were not liable to conviction or punishment for any criminal acts committed more than eighteen months prior to the presentation of the indictment. As the indictment was found April 2, 1887, all prosecutions for criminal acts committed by the defendants or either of them prior to October 3, 1885, were barred by the statute. This is fully admitted by the prosecution, and no claim is made here, and so far as the record shows, none was made in the court below, that the defendants were liable to conviction for any acts committed prior to the period of eighteen months limited by the statute.

To warrant a conviction it was doubtless incumbent on the prosecution to prove the existence of a conspiracy and the defendants' connection with it at some time within the period of limitation. But to establish those facts it was proper to resort to any competent evidence having a tendency to prove

them. In order to show that a conspiracy existed at any time subsequent to October 2, 1885, and that such conspiracy was composed of the plaintiffs in error and others, it was competent to trace the history of the conspiracy from its organization, and to show, either by the overt acts of its members or otherwise, how the conspiracy originated, what were its purposes and methods and who composed it. But having shown a conspiracy existing prior to the commencement of the period prescribed by the statute, it was incumbent on the prosecution to prove that such conspiracy continued as an existing conspiracy and that the plaintiffs in error were members of it subsequent to October 2, 1885. It being shown that a conspiracy was in existence, every overt act in furtherance of the objects of the conspiracy was, at least as to the person acting, a renewal of the conspiracy. To warrant a conviction, therefore, all that was necessary was to establish an existing conspiracy before and at the commencement of the period of limitation and overt acts in furtherance of the conspiracy afterward.

That such overt acts were shown as to all the plaintiffs in error, is, we think, beyond controversy. The only question raised is as to Ochs and Wasserman, whose terms of office as County Commissioners expired December 6, 1885, something more than two months after the commencement of the period of limitation. Without pausing to restate the evidence, it is sufficient to say, that it is abundantly shown that the conspiracy was in existence and in active operation between October 2 and December 6, 1885, and that both Ochs and Wasserman were, during that time, lending to it their active co-operation, and both are shown to have received money, the fruits of the conspiracy after October 2, 1885.

Some doubt at first occurred to us as to whether Ochs and Wasserman, who ceased to be County Commissioners December 6, 1885, and who probably at about that time withdrew from all active co-operation with the other conspirators, could properly be charged as co-conspirators with other County Commissioners, who, as their successors, came into office at the date of their retirement. On reflection, we are of the opinion that such question does not really arise in this case, as the

only question presented here is whether the six defendants who are the plaintiffs in error, are properly charged as joint conspirators. The fact that other defendants were convicted who have submitted to their sentence is, so far as this question is concerned, immaterial. It is not important now to establish their relations as co-conspirators with the plaintiffs in error. Of the six defendants who are before this court, the five who were County Commissioners were all such between October 2 and December 6, 1885, and no difficulty arises in the way of charging them as joint conspirators growing out of the fact of their not belonging to the conspiracy at the same point of time.

But were this otherwise, no legal difficulty would be presented, since the law unquestionably is, as we have already stated it in quoting the language of Mr. Greenleaf, that "every person entering into a conspiracy or common design already formed, is deemed in law a party to all acts done by the other parties before or afterward." This rule is well established by the authorities and is admitted to be the law by counsel for the plaintiffs in error. It is not necessary then, in order to charge several persons as joint conspirators, that they should be shown to have been members of the conspiracy at the same point of time. It is sufficient that each person charged as a conspirator was at some time during the progress of the conspiracy a member of it and actually co-operating to further its objects.

Most of the questions raised upon the instructions to the jury are practically disposed of by what we have already said. We have neither the time nor the inclination to enter into a discussion of the instructions in detail, but content ourselves with saying that we have examined them with care and are of the opinion that there is no material error in that respect of which the plaintiffs in error can complain.

Evidence was admitted over the objection and exception of the defendants, tending to show that in October, 1886, Wren having certain wagons and harnesses which he wished to dispose of to Cook County, and being a County Commissioner, and therefore forbidden by law to sell property to the county,

delivered said wagons and harnesses to the county as though purchased by him from another party, and to conceal the fraud, obtained a bill-head from one H. C. Walker, a dealer in that class of goods, and made out a bill for the wagons and harnesses in Walker's name and appended to it what purported to be the affidavit and signature of Walker, and had the bill, thus apparently authenticated, presented to the County Board and allowed and paid, Wren obtaining the money. Evidence was also admitted of a similar transaction in February, 1887, in which Wren transferred to the county a buggy belonging to him, and rendered a bill for the same in the name of one Frazier, a dealer in buggies, and in that manner obtained his pay from the county.

It is not shown that in either of these transactions the property was not worth the price for which Wren sold it to the county, or that the county was actually defrauded so far as the price was concerned. We have entertained grave doubts as to whether this evidence was competent, and as to whether it was not error to admit it, and on that question we are not able to entirely agree. The writer, however, has reached the conclusion that the transactions disclosed by this evidence were so far in keeping with the general scheme of conspiracy to defraud the county of its money by means of false pretenses, as to be admissible in evidence as overt acts done in furtherance of the conspiracy. The means employed to consummate the fraud were of precisely the same character as those used in case of the other overt acts proved, viz., false pretenses by means of false and fraudulent bills. As in those cases, so in these, the fraud was accomplished only by the co-operation of a number of the conspirators sufficient to audit and allow the bills. The fact that these transactions were Wren's individual enterprises and that the avails all went into his pocket, does not seem to be very material, as the general conspiracy established by the evidence was sufficiently broad and comprehensive to include, not merely the accomplishment of frauds for the benefit of the conspirators as a body, but also of such as were undertaken for the particular advantage of groups of conspirators, or of individual members of the conspiracy. Nor

does it seem to be a determining consideration that in these particular instances the county was not in fact defrauded in the sense of being induced by false representations to pay more for the property than it was worth. All acts done in further-ance of the conspiracy may be shown, whether they actually resulted in fraud or not, or whether they were or were not of such a character as to constitute, if successful, a legal fraud. But in this case the county, though receiving an adequate con-sideration for its money, was deceived into paying its money to Wren for property which he had no legal right to sell to it, and which it had no legal right to purchase from him.

But there is another view to be taken of the question. The prosecution undertook, as it had a right to do, to establish not only the fact of the conspiracy charged, but its terms, its ex-tent, its objects and its methods, by proving the overt acts of various individual conspirators. In making such proof, the prosecution was entitled to give evidence of any act or acts by any one or more of the alleged conspirators, having any legitimate tendency to establish such a conspiracy as the one charged, or to throw any light when the objects or methods of the conspiracy which the evidence already admitted tended to establish. It was for the jury to consider all the overt acts proved and determine therefrom whether any conspiracy was shown, and what were its character and objects, and their find-ing can not be impeached because the conspiracy established by the verdict differs in some of its features from the one which one or more of the overt acts in evidence might tend to prove. The writer is of the opinion that Wren's wagon and buggy transactions and the subsequent allowance of his bills therefor by the County Board, had, in the light of the other evidence, some tendency to show a conspiracy to obtain money from Cook County by one species of false pretenses, and that it was therefore competent to go to the jury in sup-port of the charge in the indictment, irrespective of whether the jury in fact based their verdict on that evidence or not.

But even if we were compelled to hold that this evidence was improperly admitted, the writer is of the opinion that it would not necessarily follow that the judgment should be re-

versed. The other evidence tending to establish Wren's guilt is clear and conclusive, and if the evidence in question had been excluded, there can be no possible doubt that the jury would have pronounced him guilty. So far, then, as the finding as to his guilt or innocence is concerned, it is demonstrable that the evidence complained of could have wrought him no prejudice.

The writer is also of the opinion that the evidence complained of had no material effect upon the measure of punishment imposed by the jury. The evidence, the competency of which is not questioned, convicts Wren, as well as the other plaintiffs in error, of a series of frauds running through a period of several years and involving many transactions and large amounts. They had been elected by the people to offices of great trust and responsibility, and were thereby made the official administrators of the vast financial and business affairs of the county. Their position demanded the exercise of the most scrupulous fidelity, and the frauds of which they stand convicted involve the additional guilt of recreancy to official duty and repeated persistent and often enormous breaches of the trust which had been reposed in their hands. Instead of protecting the public treasury from spoliation, they themselves became its plunderers. The conspiracy involved almost every branch of the county business, and compelled it in all its departments to pay them tribute. Compared with these enormous, multiplied and complicated transactions, extending through a series of years, Wren's wagon and buggy transactions are but the merest bagatelles. It would be a serious imputation upon the intelligence of the jury to suppose that they gave any special significance to these trifling acts of fraud, when passing upon the vastly more serious offenses disclosed by evidence the competency of which is not in dispute.

The punishment imposed by the jury can not be regarded as excessive in view of the evidence which is unquestionably competent, and we are at liberty to conclude from that fact that the evidence complained of, if incompetent, resulted in no injury to the defendants. Duffin v. People, 107 Ill. 113. Furthermore, said evidence, if prejudicial, was mainly, if not

solely, prejudicial to Wren, yet the other plaintiffs in error, though so far as we can see, no more criminal than he, have imposed upon them the same punishment. It would seem then that the jury, in fixing the punishment, were in no way influenced by the evidence claimed to have been improperly admitted.

· After a patient consideration of the whole record it appears that the plaintiffs in error have had a fair and impartial trial, and that they have been convicted upon sufficient and competent evidence, and that there are no errors in the rulings of the court which should entitle them to a new trial. The judgment will therefore be affirmed.

*Judgment affirmed.*

MORAN, P. J. It appears from the opinion of Mr. Justice Bailey filed in this case, that we were not able to agree with regard to the propriety of the admission by the trial court of the evidence relating to what may be termed the Frazer-Wren and Walker-Wren matters.

Concurring as I do with the views Judge Bailey has expressed on other points, I deem it just to state briefly my view with regard to said evidence. I regard said evidence as inadmissible, for the reason that in my opinion it did not tend to prove the issue. It did not prove or tend to prove an attempt to obtain money from Cook County by false pretenses.

It tended to prove simply that Wren falsely pretended in the one instance that Walker had sold an article to the county, and in the other instance that Frazer had sold an article to the county, when the truth was that in both instances Wren had furnished the article to the county himself. The clearest proof of an agreement between all the defendants to accomplish by concert of action what was accomplished in these two transactions, would not sustain the charge of conspiracy laid in the indictment, but would only show a conspiracy to enable the County Commissioner to deal with the county in violation of the statute.

The evidence was injurious to the defendant Wren, as it

tended to prove him guilty of a crime other than the one for which he was on trial, and furnished the basis of a denunciation of him as a forger and perjurer by the assistant State's Attorney in his speech to the jury.

I am unable to say that the evidence did not improperly affect the result. The admission of illegal evidence directly hurtful to the defendant, particularly where it is availed of in argument against him and pressed upon the attention of the jury as evidence of his general depravity, ought to vitiate the verdict.

As only two members of the court have taken part in the consideration of the case, a difference between us as to any question arising on the record operates to affirm the judgment. Two Judges must concur in order to reverse. Personally I feel relief in the reflection that a case so important to the people and the defendants may receive the consideration of the Supreme Court and there reach a final and authoritative determination.